IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-10346

Summary Calendar

_____

RONALD L. SHANNON, JR.,

Plaintiff-Appellant,

v.

WILLIAM J. HENDERSON, POSTMASTER GENERAL, UNITED STATES
POSTAL SERVICE

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
No. 4:99-CV-021-Y
_____

September 25, 2001

Before KING, Chief Judge, and WIENER and DENNIS, Circuit Judges.

PER CURIAM:[*]

    Plaintiff-Appellant Ronald L. Shannon, Jr. ("Shannon")

appeals from the district court's judgment in favor of Defendant-

Appellee William J. Henderson, Postmaster General, United States

---

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Postal Service ("Postal Service"), on Shannon's retaliation and disability discrimination claims under the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994) ("Rehabilitation Act"). For the reasons set forth below, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-Appellee Shannon has been employed by the United States Postal Service since 1990. From 1990 until June, 1996 he worked as a letter carrier for the U.S. Postal Service in Euless, Texas. During the course of his employment as a letter carrier with the Euless post office, Shannon suffered two on-the-job back injuries, one in 1993[1] and one on January 3, 1996.

Shannon reported his January 3, 1996 back injury to his supervisor, who provided him with a CA-17 duty status form ("CA-17") to take to his doctor. Shannon called in sick on January 5 and was examined by a doctor that day. He remained on sick leave until January 16, at which point he returned to work. The portion of the CA-17 form prepared by Shannon's doctor diagnosed Shannon with lower back injury and a possible lumbar strain and indicated that his duties should be restricted to "casing" his

---

[1] In its November 27, 2000 order partially granting the Postal Service's motion for summary judgment, the trial court ruled that any claims based on Shannon's 1993 injury were barred due to Shannon's failure to exhaust his administrative remedies by contacting an Equal Employment Opportunity counselor within 45 days of the alleged discriminatory action. See 29 C.F.R. § 1614.105(a)(1) (2000). Shannon does not appeal this determination.

2

route (i.e., sorting the mail in preparation for delivery) and to two hours of walking.

Shannon returned to his doctor for reevaluation the next day, January 17. Shannon's doctor prepared another CA-17 after this reevaluation, indicating that Shannon had a lower back injury and that he should return to work on January 19. The doctor's instructions on the second CA-17 restricted Shannon to twenty pounds of lifting, three to five hours of sitting, two hours of standing, two hours per day of continuous walking, one hour per day of kneeling, one hour per day of pulling/pushing, one half hour per day of simple grasping, three to five hours per day of fine manipulation, two to four hours per day of reaching, and one to three hours per day of driving a vehicle. Shannon was entirely restricted from twisting or climbing. He returned to work on January 19. The parties dispute whether and to what extent Shannon's supervisors respected these restrictions in assigning his job tasks from January 19 through January 31.

Shannon saw his doctor again on January 31. The CA-17 from that visit indicates his doctor's opinion that he was able to return to full-time work (i.e., eight hours per day, five days per week), subject to a restriction that he should not engage in more than two hours of walking for three weeks,[2] but could return

_____

[2] The Postal Service contends that the January 31, 1996 CA-17 form restricted Shannon to no more than two hours per day of <u>continuous</u> walking and that Shannon was actually approved to walk for more than two hours if he took intermittent breaks.

to normal walking after three weeks had elapsed. The portion of the CA-17 prepared by Shannon's employer (informing his treating physician of his normal job requirements) indicated that Shannon's duties were "subject to employee input." The parties dispute the exact meaning of this phrase. The parties also dispute whether and to what extent Shannon's supervisors respected these restrictions in assigning his job tasks for the next three weeks and whether and to what extent he requested or received accommodations subsequent to this three-week restriction.

Shannon returned to his doctor's office approximately five months later, on June 7, 1996. The physician's assistant who treated him at that time ordered an MRI test. The results of this test indicated that Shannon required back surgery. This surgery was performed in November of 1996. After his surgery and subsequent rehabilitation, Shannon could no longer perform his duties as a letter carrier.

He returned to work in July of 1997 and was assigned to perform duties as a saturation test technician — a limited duty position within the carrier craft — at a post office in Fort

---

Although this interpretation is supported by the appearance of the form, because we interpret all factual disputes in the light most favorable to the non-moving party when considering a district court's decision to grant summary judgment or judgment as a matter of law, we will assume for the purposes of this appeal that Shannon was restricted to a total of two hours per day of walking during this three week period.

Worth. In March, 1998, Shannon was offered and accepted, under protest, a permanent reassignment from the letter carrier craft to the clerk craft as a part-time flexible distribution clerk in the Fort Worth office. Shannon's position within the clerk craft involved duties substantially similar to those he performed as a saturation test technician within the carrier craft. He continues to hold this position today.

Shannon filed a discrimination complaint with the Postal Service's Equal Employment Opportunity ("EEO") office on September 12, 1996. He subsequently filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). An EEOC hearing was conducted on May 21, 1998. The EEOC made a finding of discrimination based on the Postal Service's failure to adhere to Shannon's work restrictions and awarded Shannon minimal compensatory damages for emotional distress.

Shannon objected to the EEOC decision and filed the instant action in the United States District Court for the Northern District of Texas on January 8, 1999, alleging that his supervisors discriminated against him on the basis of his disability by refusing to adhere to his work restrictions and by otherwise refusing to reasonably accommodate his disability. Shannon similarly alleged that he was discriminated against because he was "regarded as" disabled. He also asserted discrimination claims for disability harassment and disparate

5

treatment, alleging that he was treated differently than non-disabled employees and other employees with similar disabilities, and made a retaliation claim, alleging that his permanent reassignment to the clerk craft was an adverse employment action in retaliation for his filing an EEO complaint.

The Postal Service moved for summary judgment on April 27, 2000, arguing that Shannon's failure-to-accommodate claims should be dismissed because his proposed accommodations for his back injury from January 16, 1996 through June 12, 1996 were unreasonable as a matter of law and because the Postal Service made good faith efforts to reasonably accommodate his injuries during this period. The Postal Service further argued that Shannon's retaliation claims should be dismissed, contending that his reassignment was not an adverse employment action and that the Postal Service had a legitimate non-discriminatory reason for reassigning him. The district court awarded summary judgment on the retaliation claim, finding that Shannon had not established a prima facie case of retaliation because he failed to demonstrate that his reassignment was an adverse employment action.[3]

Shannon's remaining claims proceeded to trial by jury on January 3, 2001. At the conclusion of Shannon's case, the Postal Service moved for judgment as a matter of law, arguing that

---

[3] The district court also ruled in the summary judgment order that reassigning Shannon to the clerk craft after his surgery was, as a matter of law, a reasonable accommodation for his post-surgical limitations.

Shannon had not established that he was an individual with a disability as defined by the Rehabilitation Act. The court granted this motion, finding that there was no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff on the issue of disability.

Shannon timely appealed.

## II.  SHANNON'S RETALIATION CLAIM

We review the district court's grant of summary judgment to the Postal Service on Shannon's retaliation claim de novo, applying the same standard as the district court.  See Rivers v. Central and S.W. Corp., 186 F.3d 681, 683 (5th Cir. 1999). Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c).

The Rehabilitation Act prohibits retaliation against individuals who have opposed discriminatory employment practices or made charges of discrimination.[4]  See 29 C.F.R. § 1614.101 (2000) ("No person shall be subject to retaliation for opposing any practice made unlawful by . . . the Rehabilitation Act or for participating in any stage of administrative or judicial proceedings under those statutes.") (internal citations omitted).

_____

[4]  While the Rehabilitation Act contains no parallel language to the ADA provision prohibiting retaliatory discrimination, the Department of Labor has promulgated a regulation under the Rehabilitation Act barring retaliation.

7

In evaluating retaliation claims under the ADA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1994), this court has applied the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Evans v. City of Houston, 246 F.3d 344, 351 (5th Cir. 2001) (Title VII); Seaman v. CPSH, Inc., 179 F.3d 297, 301 (5th Cir. 1999) (ADA). While this court has not explicitly held that this framework would also be applicable to a retaliation claim brought under the Rehabilitation Act, both the language of the Act[5] and the findings of our sister circuits[6] indicate that the same framework should be applied to retaliation claims under the Rehabilitation Act.

---

[5] The Rehabilitation Act's anti-discrimination provision indicates that "[t]he standards used to determine whether this section has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990 and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990, as such sections relate to employment." 29 U.S.C. § 794(d) (1994).

[6] At least two circuits have explicitly noted that the same standard is applicable to retaliation claims brought under the Rehabilitation Act and the ADA. See Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001) petition for cert. filed (Jun. 28, 2001) (No. 01-264); Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001). Similarly, other circuits have applied the McDonnell Douglas framework to retaliation claims brought under the Rehabilitation Act without explicitly noting that the same standard is used for retaliation claims under the ADA. See, e.g., Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000); Williams v. Widnall, 79 F.3d 1003, 1005 n.3 (10th Cir. 1996).

8

To establish a prima facie claim of retaliation, the plaintiff must demonstrate that (1) the plaintiff engaged in a protected activity, such as filing an Equal Employment Opportunity complaint; (2) the employer took adverse employment action against the plaintiff; and (3) a causal connection existed between the protected activity and the adverse action. See Seaman, 179 F.3d at 301. Once the plaintiff has established a prima facie case, the defendant must provide a legitimate, non-discriminatory explanation for the adverse employment action. The plaintiff must then provide evidence that the employer's proffered reason is pretextual. The plaintiff retains the ultimate burden of proof to demonstrate that the adverse employment action would not have occurred "but for" the protected activity. See id; see also Evans, 246 F.3d at 354 (noting that, while the "causal link" requirement for establishing a prima facie case of retaliation does not require a "but for" test, the ultimate question of whether an employer has unlawfully retaliated against an employee requires the employee to show that the adverse employment action would not have occurred but for the plaintiff's participation in protected activity).

In granting summary judgment to the Postal Service, the district court determined that Shannon had not met the requirements for a prima facie case of retaliation. The court found that Shannon had provided insufficient evidence that the effects of his transfer to the clerk craft — including, by

plaintiff's assessment, having his leave time accrue over the course of the year rather than advanced at the beginning of the year, having his holiday pay averaged into his hourly rate rather than getting paid for holidays, loss of seniority to bid on vacation times, and loss of advancement opportunities and future earnings due to the change in craft designation — were sufficiently detrimental to constitute an adverse employment action. We find it unnecessary to determine whether a reassignment with these effects would constitute an adverse employment action. Even assuming, arguendo, that Shannon could establish a prima facie case of retaliation, the Postal Service has provided a legitimate nondiscriminatory reason for this action. Shannon has not provided any evidence indicating that this reason was pretextual.

The Postal Service argues that Shannon's reassignment to the clerk craft was a reasonable and necessary accommodation for his post-surgical medical condition, which rendered him unable to perform the duties of a letter carrier. While Shannon maintains that this reason was pretextual, he provides only two arguments in support of this position: (1) that the Human Resources and Injury Compensation Managers who reassigned him testified falsely when they indicated that they had not known about Shannon's discrimination claims when they reassigned him; and (2) that the transfer occurred approximately six months after his maximum

10

medical improvement was determined and thus could not have been a response to that determination.

Looking at the facts in the light most favorable to Shannon, we must assume that Shannon is correct in his assertion that the Human Resources and Injury Compensation Managers who reassigned him were aware that he had filed a complaint with the EEOC. While this court has indicated that an employer's awareness of an employee's protected activity might be sufficient to establish the "causal link" element of a prima facie case of retaliation,[7] see Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 684 (5th Cir. 2001), once the employer has offered a nondiscriminatory reason for the adverse action, additional evidence beyond mere knowledge is necessary to demonstrate that the employer's proffered reason for the action is pretextual. See id.

Similarly, the timing of the allegedly adverse employment action in this case does not provide evidence that Shannon's reassignment was a pretext for discrimination. While this court has recognized that "[c]lose timing between an employee's protected activity and an adverse action may provide the 'causal connection' necessary to establish a prima facie case of retaliation," Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188

---

[7] This implication in Medina is contrary to the holdings of other circuits. See, e.g., Sanchez v. Henderson, 188 F.3d 740, 747 (7th Cir. 1999) (finding that mere knowledge of a plaintiff's protected activity prior to an adverse employment action is insufficient to establish a retaliatory motive); Hughes v. Bedsole, 48 F.3d 1376, 1387 (4th Cir. 1995) (same).

11

(5th Cir. 1997), suspicious timing alone is insufficient to establish pretext.  See id.

The Postal Service has offered a legitimate, nondiscriminatory reason that explains both Shannon's reassignment and the timing of that reassignment — namely, that the reassignment was made to reasonably accommodate Shannon's changed abilities and that the delay was necessary in order to process the reassignment administratively and to craft a position in the Fort Worth office that would comply with Shannon's medical restrictions.  Shannon has provided no evidence that undermines the legitimacy of this explanation.

Because Shannon has not raised a genuine issue of material fact indicating that he would not have been reassigned "but for" his protected activities, the district court acted appropriately in granting summary judgment to the Postal Service on this claim.

III.  SHANNON'S DISCRIMINATION CLAIMS BASED ON ACTUAL DISABILITY

Shannon contends that the district court erred in granting judgment as a matter of law to the Postal Service on his disability discrimination claims.  The standard of review governing motions for judgment as a matter of law mirrors the summary judgment standard of review.  See FED. R. CIV. P. 50(a). "Judgment as a matter of law is appropriate if, after viewing the trial record in the light most favorable to the non-moving party, there is no 'legally sufficient evidentiary basis' for a

reasonable jury to have found for the prevailing party." Stokes v. Emerson Electric Co., 217 F.3d 353, 356 (5th Cir. 2000).

Shannon's primary discrimination claim is a failure-to-accommodate claim arguing that the Postal Service discriminated against him on the basis of his disability by working him beyond his work restrictions between January, 1996 (when he reinjured his back on the job) and June, 1996 (when his surgery rendered him unable to perform the duties of a letter carrier).[8] Shannon also advances disability discrimination claims based on disparate treatment, arguing that he was treated differently than employees without physical limitations and differently than employees with similar physical limitations, and on hostile work environment harassment.

In order to prevail on his claims of disability discrimination under the Rehabilitation Act, Shannon must establish a prima facie case of discrimination — i.e., he must establish that he is an individual with a disability, that he is otherwise qualified, that he works for a program or activity that

---

[8] Throughout the course of this litigation Shannon has asserted (with varying degrees of specificity) a number of other failure-to-accommodate claims. However, because the district court determined in its November 27, 2000 order granting partial summary judgment that any claims based on the 1993 injury were barred and that Shannon's reassignment to the clerk craft subsequent to his June, 1996 surgery was a reasonable accommodation (determinations that Shannon does not challenge), his only remaining discrimination claims at trial were grounded in his employer's alleged conduct between January and June of 1996.

13

receives federal financial assistance, and that he was adversely treated solely because of his disability. <u>Chandler v. City of Dallas</u>, 2 F.3d 1385, 1390 (5th Cir. 1993).

The district court held that Shannon provided insufficient evidence to demonstrate that he was an individual with a disability within the meaning of the Rehabilitation Act during the time period in question. To demonstrate that he is an "individual with a disability" as defined under the Rehabilitation Act, Shannon must demonstrate that he (1) has a mental or physical impairment that (2) substantially limits (3) one or more major life activities. <u>See</u> 29 U.S.C. § 705(9)(B) (1994). The parties do not appear to dispute that Shannon has an "impairment." However, the Postal Service contends that Shannon was not substantially limited in any major life activity between January and June of 1996.

The Rehabilitation Act regulations define "major life activities" to mean "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1614.203(a)(3) (2000). The Rehabilitation Act does not define the term "substantially limits." The definition of an "individual with a disability" is substantially the same under the Rehabilitation Act and ADA. <u>See</u> <u>Kapche v. City of San Antonio</u>, 176 F.3d 840, 844 n.27 (5th Cir. 1999). Moreover, Congress intended this definition to be given the same construction under both statutes.

14

See Bragdon v. Abbott, 524 U.S. 624, 646 (1998). Therefore, we can look to the ADA's implementing regulations[9] for guidance in interpreting these terms. Regulations promulgated by the EEOC interpreting the ADA define "substantially limits" to mean either: (1) a total inability to perform a major life activity that the average person in the general population can perform; or (2) a significant restriction on the condition, manner, or duration under which an individual can perform a major life activity as compared to the general population. See 29 C.F.R. § 1630.2(j)(1) (2000). Factors to be considered in determining whether an individual is substantially limited with respect to a major life activity include "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. at § 1630.2(j)(2).

Shannon has never clearly articulated which major life activities he was substantially limited in his ability to perform

_____

[9]     The Supreme Court has never definitively established whether the EEOC regulations interpreting the generally applicable provisions of the ADA, including the definition of disability, are entitled to judicial deference. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 479 (1999) (noting that "no agency has been delegated authority to interpret the term 'disability'"). However, this Circuit has looked to the EEOC's regulations interpreting the definition of disability for guidance in the past. See, e.g., Dupre v. Charter Behavioral Health Sys., Inc., 242 F.3d 610, 614 (5th Cir. 2001).

during the time period in question. A generous reading of the record indicates that Shannon has, at various points in this litigation, suggested that he might have been substantially limited in his ability to walk, lift, stand, "enjoy his life outside of work" and work during the time period in question. Walking and working are specifically enumerated as major life activities in the Rehabilitation Act regulations. See 29 C.F.R. § 1614.203(a)(3) (2000). This court has previously recognized lifting and standing to be major life activities as well. See Pryor v. Trane Co., 138 F.3d 1024, 1026 (5th Cir. 1998) (lifting); Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir. 1996) (standing).

With regard to Shannon's alleged inability to "enjoy his life outside of work," the record reveals that Shannon appears to be referring primarily to his abilities to engage in recreational activities after work and to socialize with his family after work. A number of courts have found that recreational activities do not constitute major life activities. See, e.g., Colwell v. Suffolk County Police Dept., 158 F.3d 635, 642-43 (2nd Cir. 1998); Wellner v. Town of Westport, -- F.Supp.2d --, 2001 WL 987492, at *2 (D.Conn. Aug. 8, 2001); Ouzts v. USAir, Inc., No. 94-625, 1996 WL 578514, at *14, n.14 (W.D.Pa. Jul. 26, 1996), aff'd, 118 F.3d 1577 (3d Cir. 1997). The record reveals that the only recreational activity that Shannon indicates he was unable to perform during the specific time period in question is

16

recreational hunting.  We find that recreational hunting is not a major life activity for the purposes of disability determinations under the ADA and the Rehabilitation Act.

Courts are split as to whether "socialization" (i.e., "the ability to get along with others") constitutes a major life activity.  Compare Soileau v. Guilford of Maine Inc., 105 F.3d 12, 15 (1st Cir. 1997) (expressing doubt that the "ability to get along with others" constitutes a major life activity) with McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) ("Because interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'").  For the purposes of this appeal, we shall assume without deciding that socialization is a major life activity.

Thus, we evaluate whether Shannon's back problems resulted in a substantial limitation on his ability to walk, lift, stand, work, or socialize with his family between January and June of 1996.  The ADA's implementing regulations instruct us to consider "working" as a major life activity only if an individual is not substantially limited with respect to any other major life activity.  See 29 C.F.R. § 1630, App., § 1630.2(j) (2000) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered.  If an individual is substantially limited in any other major life

17

activity, no determination should be made as to whether the individual is substantially limited in working."). Therefore, we begin by considering Shannon's limitations with respect to walking, lifting, standing, and socializing.

Though at least one court has suggested that it is inappropriate to look <u>exclusively</u> at the activity restrictions ordered by an individual's doctor in determining whether that individual qualifies as an individual with a disability, <u>see</u> <u>Matczak v. Frankford Candy & Chocolate Co.</u>, 136 F.3d 933, 936-37 (3rd Cir. 1997) <u>questioned on other grounds in</u> <u>Sutton</u>, 527 U.S. at 477, in the instant case the CA-17 work restriction forms are perhaps the <u>best</u> evidence available of Shannon's ability to perform many of the major life activities listed above. Shannon was subject to some restriction on his ability to walk, lift, and stand from January 19 through 31 and was subject to a restriction on his ability to walk for the first three weeks of February. However, from the beginning of the fourth week of February (when this three-week restriction expired) through June 7, 1996, Shannon's doctor had released him to return to work without any enumerated restrictions on his duties.[10] Thus, for significantly

_____

[10] Shannon maintains that he was still subject to work restrictions after his three-week walking restriction in the January 31 CA-17 expired because that CA-17 contained a note indicating that his duties were "subject to employee input." However, as this language is contained on the portion of the CA-17 that is filled out by Shannon's employer rather than his doctor, it is not relevant to our examination of Shannon's doctor's assessment of his physical capabilities.

more than half of the time period in question, Shannon was, in the assessment of his treating medical professionals, fully capable of performing all of the requirements of his job, including two to four hours per day of lifting, one to two hours per day of standing, and two to four hours per day of walking.

The remaining evidence in the record does not contradict this assessment. The record contains very little testimony from Shannon himself regarding his restrictions during this time period. While Shannon testifies in great detail about the impact of his surgery and his current, post-surgical limitations, during the six-month time period in question, the record reveals only that he was experiencing back pain and numbness that radiated down his legs, that he was attending physical therapy for his back problems, and that he considered his physical condition to be "really bad off." His testimony does not indicate any specific physical activities that he was unable to perform during this period (when he was working full time), other than that he was unable to continue his recreational hunting and that he was unable to perform overtime at work. Testimony provided by Shannon's coworkers indicates only that Shannon appeared to be in pain during this time period and that he often requested assistance so that he would not have to perform overtime at work.

While this court is sympathetic with Shannon's plight, the fact that he was experiencing pain and was unable to work overtime is insufficient to demonstrate that he was substantially

19

limited in his ability to walk, stand, or lift during the first six months of 1996, especially in light of his doctor's assessment indicating that he was able to meet the significant lifting, standing, and walking requirements of his job without restriction for more than half of the time period in question. See, e.g., Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997) (finding that plaintiff's claim that it was painful to walk did not rise to the level of a disability). Moreover, even considering Shannon's condition when he was subject to numerous restrictions, this court and our sister circuits have considered and rejected ADA claims of individuals with standing, walking, and lifting restrictions equivalent to or greater than Shannon's on the grounds that these individuals were not substantially limited in any major life activities. See, e.g., Dupre, 242 F.3d at 614 (rejecting the claim of an individual who could not stand continuously for more than one hour); Kelly v. Drexel Univ., 94 F.3d 102, 105-07 (3rd Cir. 1996) (rejecting the claim of an individual who could not walk more than one mile); Williams v. Channel Master Satellite Sys. Inc., 101 F.3d 346, 349 (4th Cir. 1996) (rejecting the claim of an individual who could not lift more than twenty-five pounds).

We turn next to Shannon's claim that his back condition substantially impaired his ability to socialize with his family in after-work hours. Although the record contains extensive testimony from both Shannon and his wife regarding the emotional

20

impact of his back problems and their effect on his family life, much of this testimony appears to be specific to the effects of his initial injury in 1993 or to the effects of his surgery and subsequent reassignment in late 1996 and 1997. Both of these time periods are foreclosed from this court's inquiry. Reading the record generously, Shannon's primary complaints with respect to his ability to socialize with his family during the six-month period relevant to this litigation appear to be that he was too tired at the end of the day to play with his children and that he was hostile and moody and otherwise unable to socialize with his family or friends in the evenings because he was preoccupied with resting and with his concerns regarding his injury.

Initially, this court notes that these effects on Shannon's ability to socialize appear to be attributable more to his work and his frustration with his treatment by his supervisors than to his injury itself. Even if we assume that Shannon's decreased ability to socialize with his family during this time period was attributable to his back condition, the evidence is insufficient to provide a triable issue of fact regarding whether these limitations rise to the level of a disability. To show that he was "substantially limited" with respect to a major life activity other than working, Shannon must demonstrate that he was "[s]ignificantly restricted as to the condition, manner or duration" under which he could perform this activity "as compared to the condition, manner, or duration under which the average

21

person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j) (2000).  While this court does not question that Shannon's injury might have constrained his ability to socialize with his family and friends, the record does not provide any evidence that Shannon was more limited in his ability to socialize than the average person who is tired after a long and frustrating workday.  Thus, Shannon cannot be deemed an "individual with a disability" based on this limitation.

Because we have found that Shannon was not substantially limited in the major life activities of walking, standing, lifting or socializing, we turn finally to assess whether he was substantially limited in his ability to work during the relevant time period.  In order to establish a substantial limitation on the major life activity of "working," Shannon must demonstrate that he was significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes.  See Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995) (citing 29 C.F.R. § 1630.2(j)(3)(i)).  Evidence of disqualification from a single position or narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity of working. See id. at 727; see also Chandler, 2 F.3d at 1392 ("An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially

22

limiting one.") (quoting <u>Jasany v. U.S. Postal Serv.</u>, 755 F.2d 1244, 1249 n.3 (6th Cir. 1985)).

Initially, it is important to note that during the time period in question, there is strong evidence that Shannon was not substantially limited in his ability to perform even the particular carrier position that he held.  He performed that job without restrictions and without significant accommodations (other than occasional assistance from other carriers so that he could avoid overtime work and the removal of two streets from his route) for most of the six month period.  Moreover, even if Shannon was substantially limited in his ability to perform his particular job and should have had greater restrictions from his doctor and greater accommodations from his employer as he contends, this is still insufficient to establish that he was substantially impaired in his ability to work.  Shannon suggests at numerous points in his testimony that there were other positions within the carrier craft that he would have been able to perform during this time period prior to his surgery, including express mail delivery or a primarily driving-based delivery route.  Thus, Shannon does not present a triable issue of fact as to whether he was substantially limited in his ability to work because he grants that he was not restricted in his ability to perform either an entire class of jobs or a broad range of jobs in various classes.

23

Because Shannon has not demonstrated that his back condition substantially limited his ability to perform any major life activity during the first six months of 1996, he has not established a prima facie case of disability discrimination under the Rehabilitation Act.  The trial court acted properly in granting judgment as a matter of law to the Postal Service on Shannon's failure-to-accommodate, disparate treatment, and disability harassment[11] claims to the extent that these claims are grounded in alleged discrimination based on <u>actual</u> disability rather than discrimination based on <u>perceived</u> disability.

IV.  SHANNON'S CLAIMS BASED ON PERCEIVED DISABILITY

Shannon also argues that he was discriminated against because he was "regarded as" disabled.  Although this claim is inadequately developed throughout this litigation, in the interest of fairness we shall nonetheless address it.

"In order to be 'regarded as' disabled a plaintiff must: (1) have a physical or mental impairment that does not substantially limit major life activities, but be treated as such by an employer;  (2) have a physical or mental impairment that substantially limits one or more major life activities, but only because of the attitudes of others toward the impairment;  or (3)

---

[11]  Membership in the protected group (i.e., "individuals with disabilities") is a requirement to succeed in a cause of action for disability-based harassment.  <u>See</u> <u>Flowers v. S. Reg'l Physician Servs., Inc.</u>, 247 F.3d 229, 235 (5th Cir. 2001).

24

have no actual impairment at all, but be treated by an employer as having a substantially limiting impairment.  The plaintiff also must establish that the impairment, if it existed as perceived, would be substantially limiting."  McInnis v. Alamo Cmty. College Dist., 207 F.3d 276, 281 (5th Cir. 2000) (internal citations omitted).

Though the exact nature of Shannon's "regarded as" claim is unclear from the record, we presume that he intends to argue that he falls within either the first or the third categories described above, i.e., that he has an impairment that is not substantially limiting but that his employer treated as such, or that he had no actual impairment but was treated as if he did. Either of these positions is nonsensical as applied to Shannon's failure-to-accommodate claim, as the basis of this claim is Shannon's assertion that his employer did not regard him as being disabled enough to warrant accommodations, not that his employer perceived him to be more disabled than he actually was.

Shannon's "regarded as" argument is similarly inapplicable to his disparate treatment claim.  The crux of this claim (as it applies to the time period at issue in this case) is that Shannon was not provided with the same type of accommodations that were provided to other employees with similar physical limitations — again, arguing that his employer did not regard him as being disabled enough, not that his employer regarded him as being too disabled to do his job.

25

Thus, we shall assume Shannon intends to argue that he was discriminated against based on perceived disability only in the sense that he was subject to hostile work environment harassment because he was "regarded as" disabled.  Specifically, Shannon's testimony indicates that two of his supervisors would sometimes tell him he was doing a bad job, two supervisors would question whether he was actually as impaired as he claimed, one supervisor would sometimes walk away rather than listen to his requests for assistance with his route, another supervisor threatened him with a letter of warning for absenteeism on one occasion, and one supervisor once "assaulted" him by poking a finger in his face.

Viewing any factual disputes in the light most favorable to the nonmoving party, we will assume that all of Shannon's allegations are true.  Nonetheless, we shall disregard the incidents where Shannon's supervisors questioned whether he was actually disabled, as these incidents indicate that his employer regarded him as physically <u>capable</u> and thus do not support his claim that he was harassed because he was "regarded as" disabled. Examining the other incidents in totality, Shannon has not alleged sufficiently pervasive disability-based harassment to state a claim upon which relief can be granted.

In order to be actionable on a hostile environment theory, disability-based harassment, like sexual harassment, must "be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."  <u>McConathy</u>

26

v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998) (quoting Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 806 (5th Cir. 1996)). Even assuming that all of Shannon's allegations are true, his supervisors' behavior, while certainly insensitive, is not sufficient as a matter of law to state a claim for hostile environment harassment. This court has recognized that "a few harsh words or 'cold shouldering' . . . [is not] an actionable offense." Id. at 564. As the few instances of harassing behaviors that Shannon reports with any specificity in his testimony are generally of the "harsh words and cold shouldering" variety, he has not provided sufficient evidence to raise a triable issue of fact as to whether he was subject to disability harassment.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.